Action by Elsie Copenhaver, administratrix of the estate of Lawrence Olin Copenhaver, deceased, against Walter Edward Tripp for wrongful death allegedly caused when defendant negligently drove a truck with its attached trailer into collision with decedent while attempting to pass decedent who was riding a bicycle.
The Circuit Court, Josephine County, Orval J. Millard, J., entered judgment in favor of the plaintiff and the defendant appealed.
The Supreme Court, Rossman, J., held that the evidence as to whether defendant's failure to provide sufficient clearance was the proximate cause of accident was insufficient for the jury.
Judgment reversed.
This is an appeal by the defendant from a judgment of the Circuit Court in the amount of $6,500.00 in favor of the plaintiff, who is the widow and the administratrix of the estate of one Lawrence Copenhaver whose death, on June 22, 1947, was the circumstance out of which the action arose. The judgment was preceded by a verdict. The action is based upon § 8-903, O.C.L.A., and averments that the defendant negligently drove a truck with its attached trailer into collision with the plaintiff's decedent who at that time was riding a bicycle, thereby causing the death.
The defendant, who is appellant, presents twelve assignments of error, the fourth of which is:
 "The trial court erred in denying defendant's motion for a directed verdict."
We shall now consider the merits of that contention.
The fatal accident occurred upon Caveman Bridge, *Page 664 
which is a part of Highway 99 immediately south of Grants Pass. The truck and the bicycle were going in the same direction, south.
The complaint charges the defendant with negligence in the following particulars:
 "That he tried to pass the decedent without sufficient room upon said highway therefor."
 "That he failed to yield the right of way to the decedent."
 "That he failed to have his truck under control."
 "That he did not give sufficient room in attempting to pass the decedent to allow clearance of the bicycle."
The answer, in addition to refuting those charges, alleges that the decedent was negligent in the following particulars:
"a. * * *
 "c. In attempting to ride said bicycle across said bridge without being competent or qualified to ride said bicycle, and to direct and control the course thereof.
 "d. In attempting to ride said bicycle across said bridge when the said Lawrence Olin Copenhaver lacked the skill necessary to ride said bicycle with reasonable safety."
The following facts are admitted: (1) The plaintiff is the widow and the administratrix of the estate of Lawrence Copenhaver, deceased; (2) the deceased lost his life June 22, 1947, upon Caveman Bridge immediately south of Grants Pass by coming into contact with a vehicle which the defendant was operating; and (3) the bicycle and the truck were both going in a southerly direction. *Page 665 
There is no contention that the defendant was operating his truck and trailer at an excessive rate of speed. The defendant swore: "I am sure I was not going twenty miles an hour, possibly eighteen." That testimony is uncontradicted and unchallenged. It is conceded that the speed of the bicycle was slow, if not very slow. Hereafter when we use the word "vehicle" we will mean the truck and trailer.
Due to the fact that the second and third specifications of negligence lacked support in the evidence, the trial judge did not submit them to the jury. He thought that the first specification was included in the fourth. There is no contention that he made any error in so construing the situation. The trial judge submitted to the jury only the fourth specification of negligence; that is, the issue as to whether or not the defendant in overtaking Mr. Copenhaver afforded him sufficient clearance.
The plaintiff cites § 115-330, O.C.L.A., which says:
 "Except as otherwise provided in § 115-331 the following rules shall govern the overtaking and passing of vehicles:
 "(a) The driver of a vehicle overtaking another vehicle proceeding in the same direction shall pass to the left thereof at a safe distance and shall not again drive to the right side of the highway until safely clear of such overtaken vehicle."
However, our Vehicle Code does not deem a bicycle a vehicle: § 115-101, subd. 5, O.C.L.A. Though § 115-330 did not state the defendant's duty to the bicyclist, it is obvious that it was the defendant's duty, as he approached the decedent and undertook to pass him, to drive with due care and afford him reasonable *Page 666 
clearance: Kalafate v. DeCook, 141 Or. 576, 18 P.2d 593; 7 Am.Jur., Bicycles, § 4, p. 736; and annotation 172 A.L.R. 736. Even though § 115-101 does not deem a bicycle a vehicle, § 115-305 says:
 "Every person riding a bicycle * * * upon a roadway * * * shall be subject to the provisions of this act * * *, except those provisions of this act which by their very nature can have no application."
The part of the Caveman Bridge which vehicles use is 27 feet wide. Flanking it upon the right and the left are curbs about eight inches high. Beyond each curb is a walk for pedestrians. The bridge appears to be of the cantilever type with the trusses or arches overhead. They parallel the curbs. The lower part of the arches enter the sidewalk, not the roadway, area of the bridge. The witnesses, in the absence of a better term, referred to the lower part of the curving arches as pillars. In view of the fact that the arches curve and have the form of large semicircles, they cannot truly be said to be pillars, but since the word "pillar" is a handy one for referring to the lower part of the arch, we too will use it. One of the pillars rises out of the sidewalk on the west side of the bridge about 52 feet south of its north end. The fatal accident occurred near that place.
The defendant is a truck operator. The over-all length of his truck and trailer is 49 feet, 6 inches. The trailer is 20 feet long and, hence, the truck's length must be about 27 feet. Its body is 15 feet long. The truck and trailer are "just under eight feet" in width, so the defendant swore. The truck has four wheels and the trailer has a similar number. At the time of the fatal mishap the vehicle, which was built for hauling *Page 667 
livestock, was loaded with 140 or 150 head of sheep. The testimony which yielded the data just mentioned is uncontradicted and unchallenged.
Before narrating further facts, we deem it well to take note of the significance of some facts we have already mentioned and of others to which we will shortly come. It will be recalled that the width of the roadway was 27 feet. One-half of that is 13 1/2 feet, and, therefore, the center line of the pavement is 13 1/2 feet from either curb. As we have seen, defendant's vehicle was "just under eight feet" in width. If its left side was upon the center line, 5 1/2 feet or a little more was between the right-hand side of the vehicle and the west curb of the roadway. The significance of those statements will be seen as we proceed.
Immediately north and west of the bridge is an auto court in which Mr. Copenhaver, his wife and children lived. Sunday, June 22, 1947, at 11:00 a.m., Mr. Copenhaver left his cottage and, using a bicycle which belonged to a neighbor's boy, rode through the court grounds to the bridge and upon the latter to his death. The day was clear and sunny. It will be noticed that the answer alleges that the decedent was incompetent to ride a bicycle. According to the testimony of one tenant of the court, Mr. Copenhaver's bicycle was "weaving a little" as he passed her door. Another tenant, referring to him, testified: "He was weaving back and forth as though the bicycle was too small for him, or as though he didn't know how to ride." The testimony of both of those witnesses and of others to like effect which we will shortly quote is uncontradicted and unchallenged. One of the two whom we just quoted said that the roadway upon which the decedent rode was covered with loose gravel. *Page 668 
The bridge is so constructed that when a pedestrian or bicyclist approached it from the north he was naturally led to the sidewalk which extends along the west side of the bridge. When Mr. Copenhaver reached the bridge he proceeded south. As we have indicated, one going south along the walk encounters a pillar when he has proceeded about 52 feet. The pillar partially obstructs the sidewalk.
Following his injury the decedent lay upon the pavement about halfway between the front and rear right wheels of the trailer. The bicycle was on top of him. A pool of blood, twelve inches in diameter and adjacent to the decedent's head, was four feet, three inches east of the west curb and 52 feet south of the north end of the bridge. Police officers, who came upon the scene immediately following the mishap, examined the bicycle and defendant's vehicle but found no marks of any kind upon either. The bicycle was entirely free from injury. The impact broke Copenhaver's left leg, injured his left shoulder and, seemingly, fractured his skull.
The defendant testified that as his vehicle approached the bridge he saw the decedent "coming on to the sidewalk out of this auto court." Going on, he said that when he started to pass the decedent the latter was riding upon the sidewalk. The defendant's wife, who was with him in the cab of the truck, swore that when she first observed Mr. Copenhaver "he was on the sidewalk between the end of the bridge and those pillars." William E. Maddox, a witness for the defendant, saw Mr. Copenhaver riding his bicycle out of the auto court grounds toward the sidewalk and also saw him when he was near the pillar which we have described. Referring to decedent's bicycle, he *Page 669 
testified: "I couldn't say whether it was on the sidewalk or whether it was on the street." Ruth Maddox was with her husband, but if she recalled whether the decedent was riding upon the sidewalk or the roadway she did not mention the fact. Hugh Gillemwater, a witness called by the plaintiff, saw the decedent an instant before the impact. He swore that the bicycle at that time was "two feet from the west curb." We believe that he meant two feet east of the west curb. The foregoing are all of the persons who saw the decedent riding the bicycle upon the bridge. It will be observed that the defendant and his wife placed him upon the sidewalk at the moment when the truck reached him. Mr. Maddox was not certain whether the decedent was upon the sidewalk or the roadway. His wife gave no testimony upon the subject. Mr. Gillemwater, as we have seen, placed the decedent two feet from the west curb an instant before the fatality. It is, of course, clear that the decedent was in the roadway when he and the vehicle came together, but it is possible that he may have ridden upon the sidewalk until he got near the pillar.
We have quoted the testimony of two witnesses that the decedent's bicycle was weaving when he was in the auto court grounds. The defendant, referring to the bicycle in its course upon the sidewalk of the bridge, testified: "He was going slow, kind of weaving back and forth like anybody would if they were riding a bicycle and going slow." Mr. Maddox, referring to the decedent, testified: "He was riding unsteadily and sort of wobbling. * * * Only he appeared — he didn't know how to ride a bicycle too well." At that time the decedent was still in the auto court, but was approaching the sidewalk. Mrs. Maddox, referring to *Page 670 
Mr. Copenhaver's course in the auto court, testified: "He was rather wobbling back and forth with the handlebars, the handlebars were — it looked as though he had just learned to ride."
One Louis Grimmer, a member of the Grants Pass police department and a witness for the plaintiff, reached the scene of the casualty while the decedent was still lying upon the pavement and while the truck with its trailer was in the position where the defendant had stopped it. According to him, the decedent lay "a good couple of feet to the right of the trailer." He was then asked, and answered, as follows:
"Q. A good couple of feet?
"A. Yes; possibly three.
 "Q. For the benefit of the jury, would you say that that three feet would be a fair estimate of the distance?
"A. I would say yes."
Referring to the position of the truck with its attached trailer, the witness testified:
 "The truck was in somewhat of a jackknifed position, as if the man might have swerved in order to miss."
According to him, the left rear wheel of the truck and the left front wheel of the trailer "were definitely over the center line" of the roadway; that is, to the east of the center line. The left front wheel of the truck and the left rear wheel of the trailer were approximately on the center line. He swore that the truck had swerved so far to the left that it blocked traffic that wished to move north. His exact words were: "We didn't feel it was safe for traffic to pass on *Page 671 
that side of the bridge; it was too close". It will be recalled that the roadway was 27 feet wide; one-half of 27 is 13 1/2. It will also be recalled that the truck was slightly less than eight feet wide.
Six persons who testified were present when the fatal accident occurred. Two of them were called as witnesses by the plaintiff and the other four, including the defendant and his wife, were called by the defendant. Their testimony is comparatively free from conflict, and we shall now review it.
Edward Kienstra was the driver of a car immediately to the rear of the defendant's truck. He saw neither Mr. Copenhaver nor his bicycle before he observed him lying upon the pavement after the fatal impact. He stopped his car when Hugh Gillemwater, who was with him in his car, cried out. In a preceding paragraph we mentioned Mr. Gillemwater. The latter saw the impact. Kienstra, like Grimmer, described the jackknife position of the truck and trailer. According to him, "if the trailer continued on its course the rear wheels would have also got him." He did not think that the truck and the trailer rendered it impossible for traffic on the other side of the bridge to pass through. In describing the distance of the body from the west curb, he employed the phraseology which we will now quote:
 "* * * if the wheels of the bicycle were put against the curb and laid down, that's just about where the body would be. * * * So it would be the distance from the curb to the seat of the bicycle."
Mr. Gillemwater was also called as a witness by the plaintiff. He and Mr. Kienstra are partners in business and operate an electric shop. Mr. Gillemwater *Page 672 
was to the right of his partner as they were driving along in their car, and, unlike Mr. Kienstra, had an opportunity to view the right lane of the roadway ahead. He swore:
 "* * * the truck was ahead of us, and he had already started onto the bridge, onto the approach of the bridge, and he turned out to pass this cyclist, and then this thing happened. He stopped and we stopped * * *."
Mr. Gillemwater saw Mr. Copenhaver "just for an instant" before the impact. He explained:
 "I really didn't see what happened. It was one instant the man was riding the bicycle, the next minute he was on the ground. It was that fast, that I didn't even see it."
According to him, "the truck stopped immediately" following the impact. He could not recall the distance that Mr. Copenhaver lay from the right side of the trailer. His description of the position of the truck and trailer upon the roadway was virtually the same as Grimmer's; that is, they had assumed a jackknife form. The left rear wheel of the truck and the left front wheel of the trailer, so he swore, were over the center line. The vehicle "was entering back into the right-hand lane," according to him. We quote again from his direct examination:
 "Q. The bicycle was already on the bridge when you first saw it?
"A. Yes.
 "Q. Where was he traveling, where was the bicycle traveling with reference to the west curb of the bridge?
 "A. He was fairly near the west curb of the bridge." *Page 673 
At that point some colloquy occurred between counsel which terminated with the following question of the presiding judge:
 "Are you able to state where the bicycle was with reference to the west curb of the traveled part of the highway there?"
The witness replied:
 "I would say he was — oh, two feet from the west curb."
Then came the following cross-examination:
 "Q. Mr. Gillemwater, at that time the truck was some distance farther out from the curb, was it not?
"A. Yes.
"Q. How much farther out — several feet?
 "A. No, the truck never only crossed over the yellow line with its dual wheels, so that would put it about six feet from the curb, in my estimation.
"Q. The truck was out about six feet from the curb?
"A. I would judge so, yes.
 "Q. And the bicycle was out about two feet from the curb?
"A. Yes, sir.
 "Q. So that it was a distance of about four feet between the bicycle and the side of the truck?
"A. Yes, that's my judgment.
 "Q. And the truck was then proceeding in a southerly direction?
"A. Yes.
 "Q. And the truck did not come in contact with the bicycle?
 "A. Not then; no, he didn't. I mean there appeared to be plenty room to me at that time.
 "Q. Appeared to be plenty of room to you at that time?
"A. Yes. *Page 674 
 "Q. Well, that was immediately before the accident occurred, was it not?
"A. Yes.
 "Q. And you don't know what caused the bicyclist then to get from a point where he was, two feet from the curb and four feet from the truck, over under the wheels of the truck?
"A. No, I don't.
 "Q. The truck didn't come in contact with the wheels of the bicycle?
"A. No. I don't know how he got under the truck.
 "Q. But as the truck was passing him you are certain that there was a distance of approximately four feet between him and the truck?
"A. Yes, approximately.
 "Q. And another two feet from the bicycle to the curb?
"A. Yes.
 "Q. And in some way which you can't explain, the man got from that point two feet from the curb down under the wheels of the truck?
"A. Yes.
"Q. Is that correct?
"A. Yes."
We come now to the defendant's testimony. We have already indicated that he saw Mr. Copenhaver coming out of the auto court upon his bicycle and riding along the sidewalk after he got upon the bridge. According to the defendant, "I was on the center line of my side. The left side of the truck was right on the center line." When his truck was near the pillar which we have mentioned he heard a scream, swerved to the left and immediately stopped the truck. Upon dismounting he noticed, so he testified, that his truck was so far over on the left side that there was not enough room for traffic to pass in the opposite direction. *Page 675 
Although he had not seen the impact, he testified: "I am satisfied it was the right front wheel of the trailer" against which the decedent fell.
The defendant's wife, who was in the cab of the truck to the right of her husband, testified that the bicycle was upon the sidewalk when she observed it. As the truck approached the bicycle she looked at Mr. Copenhaver and also observed him when he fell. Her phrases were: "He was falling the last time I saw him," and "We were clear past him when he fell." She did not see the impact. According to her, her husband drove the truck "as close to the center line as he could get it."
William Maddox, whom we have mentioned, testified that he first observed Mr. Copenhaver when he was riding his bicycle out of the auto court. Presently Mr. Maddox and his wife walked ahead and were near the pillar when the clash occurred. We now quote from his testimony:
 "We heard the brakes of a truck sound, and at that time I whirled and saw this man fall and hit his head against the tires of the truck on the pavement."
Going on, he testified:
 "He was falling toward the truck, and I saw his head strike the tire of the truck and the pavement.
 "Q. You say he was falling toward the truck — from where he was falling?
"A. From his bicycle.
 "Q. Where was the bicycle with relation to the truck?
 "A. Well, it was alongside the truck. I couldn't say whether it was on the sidewalk or whether it was on the street. *Page 676 
 "Q. You mean that the bicycle was opposite the truck, is that it?
"A. Yes, sir.
"Q. How far distant from the truck was the bicycle?
"A. I couldn't say.
 "Q. Could you give the jury your best estimate — was it a foot, two feet, ten feet?
"A. Two or three feet.
* * *
 "Q. Did you say that you saw his head strike the tire of the truck?
"A. That is the impression I had.
 "Q. Was that the first contact that you observed between the man and the truck?
"A. Yes, sir.
 "Q. Was that after he had completed this fall, after he had fallen?
"A. No, it was during the fall, as I remember.
* * *
 "Q. You say you don't know whether the man fell from the sidewalk or from the highway or the roadway next to the curb, is that right?
"A. Yes, sir."
Mrs. Maddox swore:
 "All of a sudden I heard brakes screech, turned around and saw a man, looked like his head hit the tire and then hit the cement, of the truck or I guess it was the front wheel of the trailer and I saw a bunch of blood and I screamed."
The six persons whose testimony we just reviewed are the only ones who were present at the fatality.
Albeit the answer alleges that Mr. Copenhaver was inexperienced and incompetent as a bicyclist, no evidence was introduced as to his familiarity or unfamiliarity *Page 677 
with bicycles except the facts which we have recounted. The plaintiff, who presumably had knowledge of her husband's acquaintanceship with bicycles, remained silent upon the subject, except to concede that he owned no bicycle and that the one which he rode upon the bridge belonged to a neighborhood boy.
The record mentions another car which was upon the bridge at the time of the accident, but fails to identify its location. The parties apparently attach no importance to it.
The above, we believe, is a fair synopsis of all of the evidence which pertains to the assignment of error under consideration. We know of nothing else in the record which indicates the position of the truck, the movement of the bicycle or the cause of the fatality.
As we have seen, the plaintiff depends upon the common-law demand that an overtaking vehicle grant the overtaken reasonably safe clearance. It is, of course, elementary that the burden rested upon the plaintiff to present evidence showing that the defendant's vehicle failed to clear the bicycle by a reasonably safe margin and that the failure, if such occurred, was the proximate cause of the death. The testimony of Mr. Gillemwater, witness for the plaintiff, who was immediately to the rear of the scene when death visited it, shows that the truck left about six feet of space for the bicycle. His testimony is supported and corroborated by facts which gauge and yardstick verify. He, in fact, said that "there appeared to be plenty of room."
Kalafate v. DeCook, 141 Or. 576, 18 P.2d 593, sustained the recovery by a bicycler against a motorist who struck him while overtaking him. Many similar *Page 678 
cases are digested in 172 A.L.R. 736, especially at page 743 et seq.
The complaint in the case at bar alleges:
 "The said Walter Edward Tripp at said time and place recklessly, carelessly and negligently drove and operated the said truck and trailer against the said Lawrence Olin Copenhaver and by the impact of which, the said Lawrence Olin Copenhaver was thrown from his bicycle and the truck and trailer was driven and operated by the Defendant over the body of the said Lawrence Olin Copenhaver * * *."
As we have seen, it is freely conceded that the defendant attempted to pass the bicycle, but the defendant denies that in his effort to pass the bicycle he afforded the latter inadequate clearance, and further denies that his vehicle struck the decedent or his bicycle. We know of no evidence that can warrant an inference that the truck struck the bicycle or its rider. Apparently the decedent fell from his bicycle and struck a tire of the defendant's vehicle. For instance, there is the significant fact, for which the plaintiff's as well as the defendant's witnesses vouch, that no marks of any kind were upon the bicycle or the vehicle of the defendant. Next, Mr. Gillemwater, the witness for the plaintiff whose eyes were upon the scene when death struck, testified that the defendant's vehicle was about four feet from the bicycle when the rider fell. In addition to adding that "there appeared to be plenty of room," he swore that he could not discern the cause of the fall and did not know how the decedent "got under the truck." Mr. Maddox, who did not turn to the fatal scene until he heard a noise, gave testimony, quoted upon a preceding page, indicating that when the bicycle was two or three feet from the truck its *Page 679 
rider fell headfirst against one of the tires. His wife gave testimony to like effect. As previously said, all of that evidence is free from contradiction. Those are the only witnesses to whom one can go to reconstruct the scene. Thus, it is clear that the truck did not strike the decedent. The charge that the defendant "drove and operated the said truck and trailer" against the bicyclist was refuted by the plaintiff's own witnesses. It was supported by no one.
The record leaves no room for an inference that the truck silently stole up on the decedent and by surprising him caused him to lose control of his bicycle. The specifications of negligence make no charge of that kind. They do not aver that the truck failed to warn Mr. Copenhaver of its approach or that its speed was excessive. When Mr. Copenhaver entered upon the bridge, the truck, which was a large heavy vehicle, was immediately to his left in plain sight. Its cargo weighed several tons. The truck was in a low gear, and common observation teaches that the noise made by large, heavily loaded trucks proceeding in a low gear proclaims their presence. And, finally, 23 feet or so of the truck had drawn up alongside the decedent who was moving in the same direction, thus apprising him of its presence before the mishap occurred. Therefore, this is not an instance in which a swiftly moving vehicle came alongside a bicycle without warning and caused the rider to lose control.
Nor is this an instance in which the bicycler was a boy whose youth had not acquainted him with the dangers that stalk the highways. Mr. Copenhaver was a married man, 39 years of age. The cases digested in 172 A.L.R. 736 indicate that a motorist who undertakes to pass a child upon a bicycle must take into *Page 680 
consideration, in determining how much space to accord the bicyclist, the fact that youth may be heedless of a danger that one who has achieved years of maturity would avoid.
The duty to exercise due care may require a motorist, who intends to overtake a bicycle, to give attention to the character of the roadway ahead. If there are intersections ahead or other places into which the bicyclist may wish to turn, the motorist should take into account the fact that a bicycle, especially one ridden by a boy, can turn very quickly. In the present instance, truck and bicycle were upon a straight bridge, free of all intersections. The bridge was clear of all other vehicles except one which, seemingly, was not a factor. Accordingly, the situation ahead was a simple one; neither the road nor the vehicles in sight cautioned the overtaking truck that the bicycle needed more than usual clearance.
We have not overlooked the testimony of those who saw Mr. Copenhaver riding unsteadily. Obviously, a motorist who approaches a bicycler who is experiencing manifest difficulties should take that fact into account. All of the witnesses, with the exception of the defendant, who saw the bicycle weave, made their observations while the bicycle was in the auto court. The defendant joined the two tenants of the auto court and the two Maddoxes in attributing to the bicycle a wobbly movement, but he swore that it was upon the sidewalk of the bridge when he observed it. The defendant's wife, as we have mentioned, also testified that the decedent was riding upon the sidewalk when the defendant's vehicle started to overtake it. If Mr. Copenhaver was upon the sidewalk, he was in a place where it would have been natural for him to be. Very likely *Page 681 
every bicyclist who gave heed to his safety and who was not aware that the pillars ahead partially obstructed the sidewalk would choose the safety of the sidewalk in preference to the dangers of the road. It is plain that the decedent was in the roadway when the impact occurred; however, Mr. Gillemwater was the only person who saw him riding there. His observation was confined to the brief interval of an instant. It is altogether possible that the decedent was riding upon the sidewalk when the defendant observed him and yet was in the roadway a moment or so later when Mr. Gillemwater noticed him. The obstructing pillar may have caused the decedent to transfer to the road. Giving effect, as we feel we must, to the defendant's testimony that Mr. Copenhaver was on the sidewalk when he (defendant) noticed the uncertain movement of the bicycle, we cannot say that he saw anything in the decedent's movement that cautioned him to provide for the bicycle an unusual amount of space.
The record does not disclose the cause of Mr. Copenhaver's fall from his bicycle but leaves it to surmise. The evidence warrants no inference that the truck induced the fall. Possibly the rider was inexperienced with bicycles and fell from lack of competence. If Mr. Copenhaver was riding upon the sidewalk until he neared the obstructing pillar and then changed to the roadway, it may be that he fell in making the transfer. But all of this and much more in which one is tempted to engage is conjecture. Whatever may have been the situation at the fatal moment, there is no evidence that the defendant failed to provide sufficient clearance and that the absence of the latter caused the death. As we have said previously, one of the plaintiff's own witnesses swore that "there appeared to be plenty of *Page 682 
room," and added that he did not know how the mishap occurred. Evidence presented by the plaintiff herself warrants the conclusion that the truck was not the cause of the fall, but was merely an object against which the decedent fell. The fact that the defendant's vehicle was in motion was immaterial. The result would have been the same had it been standing still or if it had been something other than a truck.
In expressing the conclusion just announced, we deem it unnecessary to compare the facts of this case with those of others to which attention has been directed. In the instant case, the evidence which disproves the charge of negligence came from the plaintiff's own witnesses. She has not sought to be relieved of the evidence which exculpates the defendant.
If it could be said that the clearance which Mr. Gillemwater described as "plenty" was, in fact, negligent in character, the situation would be within the rule which this court once more reiterated in Annereau v. Ewauna Box Co., 176 Or. 509,159 P.2d 215; that is, that if the evidence discloses with equal cogency two or more possible causes for only one of which the defendant is responsible, the plaintiff has failed to discharge the burden of proof.
We think that the evidence which the plaintiff herself presented refutes her charges of negligence and of proximate cause. The assignment of error under consideration must be sustained.
The judgment of the Circuit Court is reversed. *Page 683